IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


THERESA A. KELLEY, Individually and as   :
Administratrix of the Estate of            :
Alan C. Kelley, deceased               :
                                 :    3:07-CV-1531
           Plaintiff         :
                                 :    JUDGE VANASKIE
          v.                :
                                 :
BRADFORD COUNTY; WARDEN      :
KEVIN M. LOSINGER; WILLIAM      :
KAPICHOK; and JOHN DOES,       :
BRADFORD COUNTY PRISON       :
OFFICIALS                    :
                                 :

MEMORANDUM

      This action arises out of the tragic suicide of Alan C. Kelley ("Kelley") while he was

incarcerated at the Bradford County Correctional Facility ("BCCF"). Plaintiff Theresa A. Kelley,

individually and as administratrix of the estate of her late son, brings this civil rights action pursuant

to 42 U.S.C. § 1983 and state tort law.[1] Before the Court is Defendant's motion for summary

judgment. (Dkt. Entry 17.) For the reasons that follow, Defendants' motion will be granted.

_____

      [1] For the convenience of the reader of this Order in electronic format, hyperlinks to the
Court's record and to authority cited herein have been inserted. The Court accepts no
responsibility for, and does not endorse, any product, organization, or content at any hyperlinked
site, or at any site to which that site might be linked. The Court accepts no responsibility for the
availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or
directs the user to some other site does not affect the opinion of the Court.

I.          Background

            A.      Facts

            On Wednesday, September 7, 2005, Kelley was released on parole from the BCCF on the condition that he report to a substance abuse treatment center.  On Friday, September 9, 2005, Kelley was apprehended for leaving the treatment center to which he had been paroled; he was immediately returned to BCCF.

            Upon admission to BCCF, Kelley was evaluated by Portia Johnson, an employee of Northern Tier Counseling Services, which contracts with BCCF to perform mental health screening and counseling.  Johnson conducted an "Initial Mental Health Screening," the purpose of which was to assess whether Kelley was a suicide risk or needed any follow-up mental health care.  (See Portia Johnson Dep., Dkt. Entry 21-4, at 6.)  Johnson has a Master's Degree in Psychology, (id. at 5), and has had in-service/on-the-job training to recognize suicide threats in inmates.  (Id. at 8.)

            Johnson ultimately determined, despite past attempts at suicide and recurrent suicidal ideation, that Kelley did not have the then-current intent to commit suicide.[2]  (Id. at 19.)  Although she did not believe that he was suicidal, Johnson referred Kelley to her colleague, Steven Wilmot, for further counseling.  Specifically, she wrote Wilmot a note asking that he follow-up with

_____

            [2]The record reflects that Johnson saw Kelley in December 2002 and December 2003 on prior commitments to BCCF, at which point Kelley was characterized as being "depressed" with a "potential for suicide."  (See BCCF Narrative Note, Dkt. Entry 21-6 at 1.)

Kelley. (Steven Wilmot Dep., Dkt. Entry 21-8 at 8.) Mr. Wilmot followed up with Kelley on Monday, September 12, 2005 – three days after he was admitted to BCCF.

At the time of his follow-up, Steven Wilmot – also an employee of Northern Tier Counseling Services with a Master's Degree in Counseling and Psychology, (id. at 5) – understood that Kelley was upset about having to come back to BCCF after leaving the treatment center to which he had been paroled, and that Johnson wanted him to follow-up with Kelley to "make sure that he was okay." (Id. at 9.) Wilmot spent forty-five minutes interviewing Kelley. During that time Kelley did not mention anything that would lead Wilmot to believe that he was a suicide risk. (Id. at 15.) Wilmot, however, could not recall during his deposition whether he was aware of Kelley's prior suicide attempts and history of depression. (Id. at 12.)

In the end, neither Johnson nor Wilmot believed that Kelley was at risk of committing suicide. (Johnson Dep., Dkt. Entry 21-4 at 19; Wilmot Dep., Dkt. Entry 21-8 at 15.) If they had determined that he was a suicide risk, Kelley would have been placed on suicide watch. In the past, whenever either Johnson or Wilmot placed someone on suicide watch, their orders were followed by prison personnel. (Johnson Dep., Dkt. Entry 21-4 at 32; Wilmot Dep., Dkt. Entry 21-8 at 20.) Despite being prescribed an antidepressant – fluoxetine (Prozac) – and an

antipsychotic – risperdal – the record is ambiguous about whether Kelley received any medication while at BCCF.[3]

Ultimately, it was determined that Kelley should be placed in the general population, and no suicide or special watch was directed by any physician or mental health professional. On Thursday, September 15, 2005, at approximately 1:00 p.m., Kelley was moved from the classification unit to cell B-10, which is a general population cell. At some point, between 11:30 p.m. on September 15, 2005 and 2:00 a.m. on September 16, 2005, Kelley committed suicide. His body was discovered by Defendant Kapichok at 7:08 a.m. on September 16, 2005.

---

[3]According to the record, these medications were ordered for Kelley on 9/10/05 and were sent by the pharmacy on 9/12/05. (Kevin Losinger Dep., Dkt. Entry 21-5 at 27; Medication Admin. Record, Dkt. Entry 21-6 at 17.) There is some ambiguity about whether any medication was given to Kelley. In his deposition, Warden Kevin Losinger testified as follows in response to questioning from Kelley's attorney:

Q: And according to this form there's no indication that Kelley received any medication; is that a fair statement?
A: According to this that's correct. 8:00 on the 15th received that Fluoxetine, that's that only one that is logged and refused itchy feet medicine on the 11th.

(Losinger Dep., Dkt. Entry 21-5 at 27:21-28:3 (emphasis added).) For the purposes of deciding Defendants' motion for summary judgment, the court will resolve this ambiguity in favor of Plaintiff, and assume that no medication was given to Kelley during the final week of his life. No evidence has been presented of a causal relationship between the suicide and the failure to receive prescribed medication.

4

According to Defendant Kapichok's deposition, on the night of September 15, 2005, fellow corrections officer Jessica Saxon counted Kelley at 11:30 p.m., and observed that he was sitting on his bed. (William Kapichok Dep., Dkt. Entry 21-7 at 7-8.) During his rounds that night, Kapichok observed Kelley laying on the floor of his cell. (Id. at 8.) It was fairly common for inmates to sleep on the floor because it was cooler there than on their bunks. (Id.) This practice was going on for a long time, but since Kelley's suicide, BCCF no longer allows anyone to sleep on the floor unless they have a medical clearance. (Id. at 17; Losinger Dep., Dkt. Entry 21-5 at 34.) Kapichok's last count was at 7:08 a.m. on September 16, 2005. (Id., at 21.) During this count, Kapichok noticed that something did not look right with the way Kelley was positioned on the floor. At his deposition, Kapichok testified:

> I counted the last three of four cells there and I turned around and I was walking back down the tier and I looked in from a different direction and something didn't look right and I put my head up to the door and I said are you all right in there. I shook the door and no response so I called central and told them to open the door and when I took the step in, I could see what he did.

(Id., at 13.) When asked whether Kelley was in basically the same position that Kapichok had seen him all evening, he responded, "[y]eah, that I can recall." (Id.)

The cell that Kelley was housed in had only a 4" by 20" window in the door. (Losinger Dep., Dkt. Entry 21-5 at 31.) The lights in the cells are turned off at 11:30 p.m. each night, which means that the only light comes from the hallway. (Id. at 32-33.) When a corrections

officer performs his rounds, "he would take his flashlight and shine it through that four inch by [twenty] inch window and look and see, check for an inmate." (Id. at 31.)

Defendant BCCF has a written suicide prevention policy. (See BCCF Suicide Precautions Policy, Dkt. Entry 21-4 at 37-39.) This policy was in place at the time of Kelley's death. BCCF also conducts suicide prevention training twice per year. (Connie Morgenstern Dep., Dkt. Entry 21-3 at 20; Kevin Losinger Dep., Dkt. Entry 21-5 at 13-14.)

B.        Procedural History

Plaintiff filed the complaint on August 21, 2007, (Dkt. Entry 1), asserting that Defendants acted with intentional malice and reckless indifference by detaining Kelley rather than taking him for appropriate mental health/psychiatric care, and that this reckless indifference violated Kelley's rights under the Fifth and Fourteenth Amendments. Plaintiff further asserts that Defendant Bradford County is liable because it failed to adequately train its agents concerning suicide prevention. Plaintiff contends that Defendants' conduct violated Kelley's Eighth Amendment right to be free from cruel and unusual punishment, and to receive proper medical care and attention while confined under state authority. Finally, Plaintiff brings state law tort claims sounding in wrongful death and a survival action.

On March 27, 2009, Defendants filed an Amended Motion for Summary Judgment.[4] (Dkt. Entry 17.)  Defendants filed their brief in support on April 5, 2009.  (Dkt. Entry 18.)  After receiving additional time with leave of court, Plaintiff filed an opposing brief and other documents on May 11, 2009.  (Dkt. Entries 21-22.)  Defendants filed their reply brief on May 21, 2009.  (Dkt. Entry 23.)  The motion is ripe for disposition.

II.         Standard of Review

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); accord Saldana v. Kmart Corp., 260 F.3d 228, 231-32 (3d Cir. 2001).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" only if there is an evidentiary basis sufficient to allow a reasonable fact-finder to return a verdict for the nonmoving party.  Id. at 248.  The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party.  Saldana, 260 F.3d at 232; see also Reeder v. Sybron Transition Corp., 142 F.R.D. 607, 609 (M.D. Pa. 1992).

_____

[4]Defendants filed their original motion for summary judgment earlier that day, (see Dkt. Entry. 15), which this Court dismissed by order dated February 9, 2010.  (Dkt. Entry 24.)

7

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Upon such a showing, the burden then shifts to the non-moving party to present "specific facts showing the existence of a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The nonmoving party may not simply sit back and rest on the allegations of its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  Celotex Corp., 477 U.S. at 324 (internal quotations omitted); see also Saldana, 260 F.3d at 232 (citations omitted).  Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial."  Celotex, 477 U.S. at 322-23.  "'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.' "  Saldana, 260 F.3d at 232 (quoting Williams v. Borough of West Chester, 891 F.2d 458, 460-61 (3d Cir. 1989)).

III.        Discussion

Plaintiff brings § 1983 claims against Defendants Losinger and Kapichok as individuals, as well as claims against Bradford County as a municipality.  The court will address these claims separately.

8

A.     Individual Defendants

Plaintiff alleges that Defendants Kapichok and Losinger violated Kelley's right to be free from cruel and unusual punishment and his right to receive adequate medical care under the Eighth Amendment, as well as his due process rights guaranteed by the Fifth and Fourteenth Amendments.[5]  The court will address each of Plaintiff's claims in turn.

1.  Eighth Amendment

Plaintiff's claims present a difficult set of facts because no state action directly inflicted harm upon Kelley; he took his own life.  Of course, this does not mean that there can be no § 1983 liability, it simply means that Plaintiff must come forward with some evidence that the actions of Defendants constitute deliberate indifference to Kelley's serious medical needs or amount to cruel and unusual punishment.  In the Third Circuit, a plaintiff in a prison suicide case must establish three elements: "(1) the detainee had a particular vulnerability to suicide, (2) the custodial officers [knew of and disregarded that vulnerability],[6] and (3) those officers acted with

---

[5]The allegations in Plaintiff's complaint are sparse as to Defendant Losinger, and it is unclear from the pleadings whether he was sued in his individual capacity or only in his capacity as the warden of BCCF.  In fact, neither party explicitly mentions Losinger in their briefs.  For the purpose of deciding this motion, the court will assume that Defendant Losinger was sued in both his individual and official capacities.

[6]The Third Circuit in Colburn v. Upper Darby Twp., 946 F.2d 1017 (3d Cir. 1991), articulated the second prong of the test as whether the custodial officers "knew or should have known" of the prisoner's vulnerability, id. at 1023, but that standard has been modified by the

(continued...)

9

reckless indifference to the detainee's particular vulnerability." Colburn v. Upper Darby Twp., 946 F.2d 1017, 1023 (3d Cir. 1991) (citation omitted). As recently observed in Minix v. Canarecci, No. 09-2001, 2010 WL 668893, at *8 (7th Cir., Feb. 26, 2010), a party seeking relief in a jail suicide case must present evidence that is sufficient "to overcome the 'high hurdle' set by the deliberate indifference standard for liability under § 1983."

### a. Particular Vulnerability to Suicide

In retrospect, it is easy to second guess the decision of BCCF officials not to place Kelley on suicide watch. After all, it is now apparent that Kelley had a particular vulnerability to suicide because he, in fact, took his own life. The standard, however, requires the Court to assess whether at the time that prison officials acted (or failed to act) there was "a strong likelihood, rather than a mere possibility, that self-inflicted harm [would] occur." Colburn, 946 F.2d at 1024.

Here, drawing all inferences in favor of Plaintiff as the non-moving party, a reasonable jury could conclude that Kelley was particularly vulnerable to suicide. Kelley had a

---

<sup>6</sup>(...continued)

Supreme Court. In Farmer v. Brennan, 511 U.S. 825 (1994), the Supreme Court held that a prison official cannot be found liable under the Eighth Amendment "unless the officer knows of and disregards an excessive risk to inmate health or safety." Id. at 837. Thus, the Colburn test has been re-characterized to conform to the standard established by the Supreme Court. Other courts have likewise held that the plaintiff in a prison suicide case must show that "'defendant: (1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk.'" Minix v. Canarecci, No. 09-2001, 2010 WL 668893, at *4 (7th Cir., Feb. 26, 2010). Accord, Drake ex rel. Cotton v. Koss, 445 F.3d 1038, 1042 (8th Cir. 2006); Gray v. City of Detroit, 399 F.3d 612, 616 (6th Cir. 2005).

known history of suicidal ideation and past attempts.  On September 9, 2005, he appeared

depressed, and indicated that he had thought about suicide, but stated that he did not then have a

current plan.  From these facts, a fact-finder could reasonably infer that Kelley was vulnerable.

b.  Defendant's knowledge

To satisfy the second prong of the <u>Colburn</u> test, the named defendant prison official

must have had "a *subjective* awareness of a substantial risk of serious harm.  Thus, a plaintiff must

show actual awareness of the risk, not just that the risk would have been perceived by an

objective, reasonable person." <u>Litz v. City of Allentown</u>, 896 F.Supp. 1401, 1410 (E.D. Pa. 1995)

(emphasis in original) (citing <u>Farmer v. Brennan</u>, 511 U.S. 825, 837-38 (1994)).  "The official must

both be aware of facts from which the inference could be drawn that a substantial risk of serious

harm exists, and he must also draw the inference." <u>Farmer</u>, 511 U.S. at 837.  As stated in <u>Gray v.

City of Detroit</u>, 399 F.3d 612, 616 (6th Cir. 2005), "'the test for deliberate indifference is a

subjective test . . . not an objective test or collective knowledge.'"

Plaintiff has produced no evidence whatsoever that either Losinger or Kapichok was

aware of that Kelley posed a substantial risk of self-harm.  Here, two individuals with mental health

backgrounds determined, after one-on-one assessments, that Kelley was not a suicide threat, and

that he should not be placed on suicide watch.  There is absolutely no evidence that either

Defendant Losinger or Kapichok had any knowledge of Kelley's prior history of suicide attempts or his current depressive state.

Warden Losinger testified that Kelley had been a "trustee" while housed at the BCCF. (Kevin Losinger Dep., Dkt. Entry 21-5 at 38.) Kelley had not previously posed a management problem, and his behavior had been fairly consistent. (Id.) No evidence has been presented to suggest that Kelley gave Losinger or Kapichok any reason to regard him as suicidal upon his return to the BCCF.

Rather than focus on what Defendant Losinger or Kapichok knew of Kelley's condition, Plaintiff focuses on what they should have known, and states that Kapichok is liable because he "ignored [Kelley's] situation, and, in fact, did not check him at all during the evening hours." (Pl's. Br. in Opp'n to Summ. J., Dkt. Entry 22 at 12.) As to the first assertion, it is immaterial what either Losinger or Kapichok "should have known," as that is not the standard upon which the Court addresses Plaintiff's claims. The Supreme Court was abundantly clear in Farmer that in order for individual liability to attach under the Eighth Amendment, the individual must have a subjective awareness of a risk of substantial harm. 511 U.S. at 837-38. There are no facts in the record suggesting that either Losinger or Kapichok had *any* knowledge of Kelley's state of mind.

Plaintiff's second assertion – that Defendant Kapichok ignored Kelley's situation and did not check on him during the night – is contrary to the uncontested facts. Kapichok testified

during his deposition that he made rounds and checked on all prisoners during his shift on the night

that Kelley committed suicide.  (Kapichok Dep., Dkt. Entry 21-7 at 11.)  He testified that during

each round he observed Kelley laying on the floor – a common occurrence at the time – and

thought nothing of it because he believed him to be sleeping.  (Id. at 13.).  Finally, he testified that

on his last set of rounds something looked amiss with the way Kelley was positioned on the floor,

and that he immediately radioed for Kelley's cell to be opened so that he could check on him.  (Id.)

Nothing in the record contradicts this testimony.  That Plaintiff disbelieves Kapichok is of no

consequence.  At this stage of the proceedings, Plaintiff cannot dispute Kapichok's version of

events based upon information and belief.  Rather, Plaintiff must come forward with evidence from

which a reasonable fact finder could conclude that Kapichok's version of events is incorrect.  See

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (holding that summary judgment should be

granted where a party "fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden at trial.").

Moreover, it appears that when Kapichok subjectively became aware that something

might be wrong with Kelley, he acted; the fact that he acted too late does not mean that he was

deliberately indifferent to Kelley's needs.  See Liebe v. Norton, 157 F.3d 574, 578 (8th Cir. 1998)

(negligence in not checking more frequently on inmate who committed suicide would not support a

civil rights claim).   At best, drawing all inferences in favor of Plaintiff, Kapichok acted negligently in

13

not more thoroughly checking on Kelley throughout the night. Negligence, however, does not give rise to an Eighth Amendment violation. See Farmer, 511 U.S. at 837-38 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not . . . cannot be condemned as the infliction of punishment.") Because Plaintiff has failed to come forward with evidence from which a reasonable fact finder could conclude that Defendants Losinger or Kapichok consciously disregarded Kelley's particular vulnerability to suicide, Plaintiff's Eighth Amendment claims fail.[7]

### 2. Due Process

Plaintiff also alleges that the failure of Defendants Losinger and Kapichok to act makes them liable under § 1983 pursuant to the Due Process clause of the Fifth and Fourteenth Amendments to the United States Constitution. "[T]he Due Process Clause is simply not implicated by a *negligent* act of an official." Daniels v. Williams, 474 U.S. 327, 328 (1986) (emphasis in original). Rather, liability requires "more than ordinary lack of due care for the prisoner's interests or safety." Whitley v. Albers, 475 U.S. 312, 319 (1986). The Third Circuit has noted that "the standard of culpability for substantive due process purposes must exceed both negligence and deliberate indifference, and reach a level of gross negligence or arbitrariness that indeed 'shocks the conscience.'" Miller v. City of Philadelphia, 174 F.3d 368, 375-76 (3d Cir. 1999).

---

[7] As for Defendant Losinger, Plaintiff has adduced no evidence from which a reasonable fact finder could conclude that he was deliberately indifferent to a known risk of suicide.

14

Here, like the analysis under the Eighth Amendment, there is no evidence from which a reasonable fact finder could conclude that Defendants Losinger and Kapichok's inaction was anything other than, at most, negligence. Even assuming that Defendant Kapichok should have noticed Kelley's condition before 7:08 a.m. on September 16, 2005, his failure to do so was not wanton, deliberate, reckless or intentional. The uncontradicted facts indicate that Kapichok checked on Kelley throughout the night, but perhaps not as completely as he should have. At best, this makes Kapichok negligent, and negligence is not enough to give rise to a violation of Kelley's substantive due process rights. Accordingly, Plaintiff's Fifth and Fourteenth Amendment claims fail against the individual Defendants.

B.    Bradford County

Plaintiff also brought § 1983 claims against Bradford County and John Does Bradford County Prison Officials, as well as Defendants Losinger and Kapichok in their official capacities. A municipality and its officials acting in their official capacities can be sued directly under § 1983 only if an action pursuant to a municipal policy, practice or custom directly causes a constitutional tort. Monell v. N.Y. City Dep't of Soc. Svcs., 436 U.S. 658, 691 (1978). A municipality or supervisor, however, cannot be held liable solely because it employs a tortfeasor; there is no *respondeat superior* liability under § 1983. Id.

In the brief in opposition to Defendants' motion for summary judgment, Plaintiff cites nine instances where she believes there are material facts in dispute, all of which surround policies that Plaintiff believes Bradford County enacted and caused or contributed to Kelley's suicide:

1. Bradford County has, at all times material, operated a prison in an overcrowded, overheated state, requiring inmates to sleep on the floor, preventing corrections officers from adequately observing inmates as they sleep.

2. Bradford County employs a practice which includes employment of an unqualified, untrained, inexperienced individual to serve as the chief operating officer of an overcrowded, overheated prison.

3. Bradford County has engaged in a policy of attempting to shift its responsibility to screen and evaluate inmates for medical or mental health issues or potential for suicide to a private company which employs a person with absolutely no training or experience in identifying inmates who pose a potential for suicide.

4. Bradford County engages in a policy which does not permit the free flow of important mental health information concerning inmates to corrections officers and individuals such as Steven Wilmot employed by Northern Tier.

5. Bradford County employs a policy of disregarding inmate needs for medication, especially psychotropic medication prescribed for the purpose of treating mental health issues, specifically depression and other disorders which, if untreated, may lead to suicide.

6. Bradford County engages in a policy within its prison of failing to provide for any follow up when an inmate who is prescribed medication fails to appear at the medication cart to receive his prescribed medication.

7. Bradford County engages in a policy which permits inmates with mental health issues and a history of suicide thoughts, plans and attempts, when admitted in a depressed state, to be housed as the single occupant of a cell out of sight and out of sound of the on-duty corrections officer.

8. Bradford County engages in a policy of housing an inmate such as the decedent in a cell which is so dark and with such limited visibility that, apparently, it was impossible for Corrections Officer Kapichok to observe for a period of six to seven hours decedent's having hanged himself in his cell.

9. Bradford County has engaged in a policy involving inadequate training of corrections officers with regard to identifying suicide risks and preventing suicides within the prison. Its warden testified that he thought a particular individual provided training. Officer Kapichok testified that the training amounted to watching a movie and "going over some things." No documents, course plans, lesson plans, or other evidence of specific training has been submitted and/or provided by the Defendants in this case, leading to the conclusion that none exist.

(Pl.'s Br. in Opp'n to Summ. J., Dkt. Entry 22, at 8-9.)

This recitation of "disputed facts" is unsupported by the evidence before the court. With the exception of a policy permitting inmates to sleep on the floor, there is no evidence that any of the other eight alleged policies existed. Instead, the evidence suggests that Bradford County employed a suicide prevention policy, conducted suicide training for its entire staff one to

two times per year, and conducted mental health screening of all inmates entering the prison to assess whether the entering inmate poses a risk of suicide.[8]

The only policy for which there is evidence in the record is BCCF's policy of permitting inmates to sleep on the floor. Plaintiff argues that had this policy not existed, Kapichok would have discovered Kelley sooner than he did and may well have prevented his suicide. Plaintiff's argument has superficial appeal; however, it ultimately proves specious because it relies on a relaxed standard of causation that is appropriate in negligence actions, but not civil rights actions based upon the alleged deliberate indifference of a state actor to a substantial risk of harm to Plaintiff.

"To prevail and recover damages on [a] section 1983 claim under . . . a deliberate indifference . . . theory [the plaintiff] must prove that [defendants'] actions were both the actual and

---

[8]Plaintiff asserts that the case should be permitted to go to a jury because it needs to be evaluated "in its entirety . . . to determine whether basic constitutional rights have been violated by the County's practices and policies." (Pl.'s Br. in Opp'n to Summ. J., Dkt. Entry 22, at 11.) Plaintiff's expert report, however, is silent on the issue of the competencies of the mental health evaluation, and instead opines that Kelley's suicide could have been prevented "had BCCF correctional staff been appropriately trained in suicide prevention and intervention techniques and had [Defendant] Kapichok been more attentive to his duties and responsibilities during his rounds." (Dr. Alvin Cohn's expert report, Dkt. Entry 18-3, at 4.) Plaintiff's expert, however, never delineates what deficiencies in training existed that could have been implemented or what polices contributed to Kapichok not discovering Kelley until well-after his suicide. Quite simply, although Plaintiff's expert opines that Defendants are liable for Kelley's death, he fails to articulate an adequate basis for his conclusions. Therefore, his opinions do not suffice to defeat the summary judgment motion.

the proximate cause of [the plaintiff's] injuries." White v. Roper, 901 F.2d 1501, 1505 (9th Cir. 1990). That is, a § 1983 plaintiff may only recover damages for injuries that would not have occurred "but for" the alleged wrongful conduct. Id. Thus, where, as here, "the deliberate indifference takes the form of an omission – a failure to act – the proximate cause inquiry requires at a minimum that the plaintiff's injury would not have occurred but for the defendant's failure to take the curative action." Hvorcik v. Sheahan, 847 F. Supp. 1414, 1425 n.28 (N.D. Ill. 1994). Absent competent proof that the alleged violation of a constitutional right proximately caused the injury for which damages are claimed, no recovery is possible. See Horn by Parks v. Madison County Fiscal Court, 22 F.3d 653, 659 (6th Cir. 1994). Furthermore, where it is contended that inadequate safety policies – such as allowing inmates to sleep on the floor – caused the constitutional deprivation in question, the plaintiff must demonstrate that prison officials had "(1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval to the offending subordinate." Freedman v. City of Allentown, 853 F.2d 1111, 1117 (3d Cir. 1988) (citing Colburn v. Upper Darby Twp., 838 F.2d 663, 673 (3d Cir. 1988)).

   Here, there is no evidence from which a reasonable jury could conclude that the practice of permitting inmates to sleep on the floor would lead to a prisoner's suicide. Plaintiff has

19

adduced no evidence that this practice has ever contributed to a suicide in the past, or that Bradford County officials had any knowledge that it was likely to contribute to a suicide. Absent this sort of evidence, Plaintiff's constitutional claims against Bradford County and its officials fail.

Moreover, to establish the liability of a municipal defendant, such as Bradford County, Plaintiff must show that a responsible policymaker was aware of a substantial risk of inmate suicide and of alternative to prevent them, but deliberately chose not to pursue such alternatives or acquiesced in a longstanding policy or custom of inaction. See Simmons v. City of Philadelphia, 947 F.2d 1042, 1064 (3d Cir. 1991). No evidence pertinent to this requirement for liability of a governmental entity has been presented here. There is no evidence of an unusual incidence of suicide at the BCCF. The fact that a suicide prevention policy had been adopted by the BCCF is inconsistent with deliberate indifference. See Liebe, 157 F.3d at 579 ("the County's policy cannot be both an effort to prevent suicides and, at the same time, deliberately indifferent to suicides.") Moreover, that Plaintiff's expert does not challenge the sufficiency of the policy precludes a finding of deliberate indifference. See Gray, 399 F.3d at 618-19. As in Cruise v. Marino, 404 F. Supp. 2d 656, 671 (M.D. Pa. 2005), the requisite "'proof of a conscious choice by the identified policy makers to implement a policy which affords prisoners insufficient protection in light of the information available to the policymakers concerning the risk of suicide and in light of

feasible alternatives for prevention thereof which were deliberately not implemented' is simply not presented in this case."

Nor can liability be premised upon a bare assertion of a failure to train. Id. at 674. In view of the fact that a suicide prevention policy was in place, training was provided to BCCF staff, and the absence of evidence of the incidence of suicides at BCCF, it cannot be said that "the need for more or different training [was] so obvious and the inadequacy so likely to result in the violation of constitutional rights, that the [County] ... can reasonably be said to have been deliberately indifferent." City of Canton v. Harris, 489 U.S. 378, 390 (1989). Accordingly, Bradford County and the individual Defendants sued in their official capacities are entitled to summary judgment. See Gray, 399 F.3d at 619 ("Any failure of the city to train or discipline its officers with respect to its policies on preventing suicides by pre-trial detainees did not rise to the level of choosing to ignore obvious risks of foreseeable suicide attempts."); Liebe, 157 F.3d at 579 (affirming entry of summary judgment in favor of county where evidence of failure to train in jail suicide case did not support an inference of deliberate indifference); Cruise, 404 F. Supp. 2d at 674-75 (same).

C.       State created danger

In the brief in opposition to summary judgment, Plaintiff spends considerable time arguing that Defendants are liable for the harm that Kelley inflicted on himself under the state

created danger doctrine. In a state-created danger context the "deliberate indifference" standard applies, and careless conduct does not suffice to impose liability. As stated in Davidson v. Cannon, 474 U.S. 344, 347-48 (1986):

> [L]ack of care simply does not approach the sort of abusive government conduct that the [Constitution] was designed to prevent. Far from abusing governmental power, or employing it as an instrument of oppression, [the prison officials] mistakenly believed that the situation was not particularly serious. . . . The guarantee of due process has never been understood to mean that the State must guarantee due care on the part of its officials.

Moreover, "[t]here must be a direct causal relationship between the affirmative act of the state and plaintiff's harm." Kaucher v. County of Bucks, 455 F.3d 418, 432 (3d Cir. 2006). This "direct causal relationship" is established only where the defendant's conduct was the "but for cause" of the harm sustained by the plaintiff. Id.

Alan Kelley's suicide was a tragic event, and this Court's sympathies are with his family. In the end, Plaintiff wants this Court to infer from the act of suicide itself that the prison officials recklessly disregarded their obligation to take reasonable precautions to protect Kelley and others entrusted to their care, but this is an inference that neither this Court nor a reasonable fact finder is permitted to make. See Freedman, 853 F.2d at 1115 (stating that no inference that prison officials acted recklessly can be drawn merely from the prisoner's act of suicide). At best, Defendants were negligent in permitting inmates to sleep on the floor, and for not more thoroughly

22

checking on inmates during the night, and a state actor does not violate a person's civil rights by merely negligent conduct. See Davidson, 474 U.S. at 347-48 ; Freedman, 853 F.2d at 1117.

D.      State law claims

In addition to federal constitutional claims, Plaintiff's Complaint asserts state wrongful death and survivor claims.  (Compl., Dkt. Entry 1, ¶¶ 49-57.)  Because the Court will grant summary judgment on Plaintiff's § 1983 claims, it will decline to exercise its supplemental jurisdiction over the remaining state law claims.  28 U.S.C. § 1367(c)(3).

The Court of Appeals for the Third Circuit has stated that when determining whether to exercise supplemental jurisdiction, "the district court should take into account generally accepted principles of judicial economy, convenience, and fairness to the litigants." Growth Horizons, Inc. v. Delaware County, PA., 983 F.2d 1277, 1284 (3d Cir.1993) (quoting United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966)).  A federal court should avoid needless decisions of state law both as a matter of comity and to promote justice between the parties.  If the federal claims are dismissed prior to trial, even though not insubstantial in a jurisdictional sense, the non-federal claims should be likewise dismissed.  Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir.1995) (citing United Mine Workers, 383 U.S. at 726-27).

There is no overarching interest of judicial economy or convenience in adjudicating state law claims against other parties.  Nor is there any apparent unfairness in dismissal, without

23

prejudice, of the non-federal claims against Defendants. The Court, in the exercise of its discretion under 28 U.S.C. § 1367(c)(3), will "decline to exercise supplemental jurisdiction" over Plaintiff's state claims against Defendants.

IV.       Conclusion

For the foregoing reasons, the Court will grant Defendants' motion for summary judgment, (Dkt. Entry 17), and will decline to exercise supplemental jurisdiction over Plaintiff's remaining state law claims.  An appropriate Order follows.


s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge

THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

THERESA A. KELLEY, Individually and as    :
Administratrix of the Estate of            :
Alan C. Kelley, deceased                   :
                                           :    3:07-CV-1531
                    Plaintiff              :
                                           :    JUDGE VANASKIE
          v.                               :
                                           :
BRADFORD COUNTY; WARDEN                     :
KEVIN LOSINGER; WILLIAM                     :
KAPICHOK; and JOHN DOES,                    :
BRADFORD COUNTY PRISON                      :
OFFICIALS                                  :
                                           :

ORDER

AND NOW THIS 23rd DAY OF MARCH, 2010, for the reasons set forth in

the foregoing Memorandum, IT IS HEREBY ORDERED THAT:

1.    Defendants' Motion for Summary Judgment, (Dkt. Entry 17), is GRANTED;

2.    Pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise

      supplemental jurisdiction over Plaintiff's state law claims against Defendants,

      and those claims are DISMISSED WITHOUT PREJUDICE;

3.    The Clerk of Court is directed to enter judgment for Defendants against

      Plaintiff on Plaintiff's federal constitutional claims and mark this matter

CLOSED.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge